G. A. MADDUX, Appellant, v. ST. LOUIS UNION TRUST COMPANY, Respondent.

St. Louis Court of Appeals, December 8, 1914.

1. **REAL ESTATE BROKERS: Right to Commission.** A real estate broker who procures a purchaser ready, willing and able to buy on the owner's terms is entitled to the agreed commission, although the sale was not completed because of a defect in the title, and especially is this so where the brokerage contract required the owner to furnish an abstract showing good title.

2. ———: ———: **Representing Adverse Interest.** A broker who represents an adverse interest without the consent of his principal forfeits his commission.

3. ———: ———: ———. The doctrine that a real estate broker forfeits his commission if he represents an adverse interest, without the consent of his principal, is based on fraud, and such conduct, therefore, may not be presumed, but must be found from facts constituting substantial evidence on the issue.

4. **FRAUD AND DECEIT: Evidence.** Fraud cannot be presumed nor established by conjecture or suspicion, and substantial evidence is required to prove it.

5. **REAL ESTATE BROKERS: Right to Commission: Representing Adverse Interest: Sufficiency of Evidence.** In an action by a real estate broker for a commission for finding a purchaser for real estate, defended on the theory that the broker had forfeited his commission by reason of the fact that he had represented the buyer without the consent of defendant, evidence *held* insufficient to warrant the submission of the defense to the jury.

Appeal from St. Louis City Circuit Court.—*Hon. Irvin V. Barth*, Judge.

REVERSED AND REMANDED (*with directions*).

*Chas. B. Stark*, for appellant; *Parks & Bell* and *C. F. Schneider* of counsel.

(1) It is well-settled law in this State that a real estate broker performs his duty, and is entitled to his commissions, when a purchaser is introduced who is ready, willing and able to buy on the terms authorized by the principal. Gelatt v. Ridge, 117 Mo. 553; Finley v. Dyer, 79 Mo. App. 604; Hayden v. Grillo, 42 Mo. App. 1, s. c., 35 Mo. App. 647; Bailey v. Chapman, 41 Mo. 536; Love v. Owens, 31 Mo. App. 501; Collins v. Fowler, 8 Mo. App. 588; Cheatham v. Yarbrough, 90 Tenn. 77. (2) The principal cannot relieve himself from liability for commissions by a refusal to consummate the sale. Bailey v. Chapman, 41 Mo. 536; Hayden v. Grillo, 35 Mo. App. 647; Glentworth v. Luther, 21 Barb. 145; Kock v. Emmerling, 22 How. (U. S.) 69. (3) Nor because of a defect in his title. Christensen v. Wooley, 41 Mo. App. 53; Collins v. Fowler, 8 Mo. App. 588; Fisher v. Drewest, 7 Rep. 351; Love v. Owens, 31 Mo. App. 501; Gonzales v. Broad, 57 Cal. 224; Cavender v. Waddington, 5 Mo. App. 457; Cheatham v. Yarbrough, 90 Tenn. 77; Mechem Agency, secs. 966, 967; 2 Addison Contr., sec. 931; 2 Am. & Eng. Ency. Law, 578, 581; McGavock v. Woodlief, 20 How. (U. S.) 221; Kock v. Emmer-

ling, 22 How. (U. S.) 69; Frazier v. Wycroff, 63 N. Y. 448; Cook v. Fish, 12 Gray, 493; Vinton v. Baldwin, 88 Ind. 104; Gilchrist v. Clarke, 2 Pickle, 585; Parker v. Walker, 2 Pickle, 569; Roberts v. Kimmons, 65 Miss. 332. (4) The condition prescribed by the purchaser that a good title should be made to her was merely what the law implied without incorporating it in her contract and did not relieve the vendors from liability for commissions. Roberts v. Kimmons, 65 Miss. 332; Folliard v. Wallace, 2 Johns. 395; Middleton v. Findla, 25 Col. 76; Hamlin v. Schulte, 34 Minn. 534; Gauther v. West, 45 Minn. 192; Crosto v. White, 3 N. Y. Supp. 682; Hally v. Gosling, 3 E. D. Smith, 262; Birmingham Co. v. Thompson, 86 Ala. 146. (5) The plaintiff's case having been fully established by documentary evidence and by the deposition of the sole witness in the case it was the duty of the court to give the peremptory instruction for a verdict as prayed by the plaintiff. Bank v. Hainline, 67 Mo. App. 483; Morgan v. Durfee, 69 Mo. 469; Commissioners v. Clark, 94 U. S. 278; Connor v. Giles, 76 Me. 132; 2 Thompson on Trials, sec. 2249; Proffatt Jury Trial, secs. 351, 352, 354 and cases cited.

*Henry B. Davis, Charles Erd* and *Carlisle Durfee* for respondent.

(1) A real estate agent or broker cannot represent both the buyer and seller in the same transaction, unless with the implied or express assent of the parties represented. And either principal, without showing injury to himself, may avoid a contract made by a dual agent, without his knowledge of such dual agency. Lawson on Contracts (1 Ed.), sec. 181; Corder v. O'Neil, 207 Mo. 632; Connor v. Black, 119 Mo. 126; Chapman v. Currie, 51 Mo. App. 43; Winter v. Carey, 127 Mo. App. 601; Witte v. Storm, 236 Mo. 470. (2) And either principal may avoid the con-

tract, to the extent of refusing to reimburse the agent for any expenditures which he may have been authorized to make in the course of his negotiations for a sale of the property. 31 Cyc. pp. 1539-1540; R. R. v. Morris, 10 O. Cir. Ct. 502; Williamson v. Lumber Co., 43 Ore. 337.

NORTONI, J.—This is a suit by a real estate agent for his commissions. The finding and judgment were for defendant and plaintiff prosecutes the appeal.

It appears that plaintiff is a real estate agent, doing business at Nashville, Tennessee. The suit was originally instituted against Matilda J. Childress and her husband, Thomas B. Childress, for commissions said to have been earned by the agent in finding a purchaser who was ready and able and willing to buy certain real estate owned by Matilda J. Childress in Nashville. After the suit was instituted and before the trial, both defendants departed this life at St. Louis, Missouri, where they resided. The real estate was owned by Matilda J. Childress alone, and, as before said, situate at Nashville. Her husband, Thomas B. Childress, was, therefore, but a nominal party defendant. As to him the suit abated at his death, but it was revived against the estate of Matilda J. Childress and the present defendant, St. Louis Union Trust Company, as executor of her estate, substituted as a party defendant in her stead.

It appears that Matilda J. Childress desired to sell her property situate on Cherry street in Nashville, Tennessee, at the price of $50,000. Plaintiff came to St. Louis on May 28, 1909, visited Mrs. Childress and her husband, and arranged with them to represent her in making the sale for a commission of $1000. A written contract was entered into by Mrs. Childress and her husband on that date, whereby plaintiff was authorized to sell the property for $50,000. However, it was agreed in the contract of agency that Mrs.

Childress would borrow $22,000 on the property from the Northwestern Mutual Life Insurance Company at five per cent interest, which loan the purchaser should assume and also pay to Mrs. Childress $18,000 in cash and give a second mortgage on the property to Mrs. Childress for $10,000, to be represented by two separate notes bearing six per cent interest. It was further stipulated, too, that Mrs. Childress would furnish an abstract showing good title to the property, which should be delivered to the purchaser.

On the following day, May 29, 1909, plaintiff effected a sale of the property to Mrs. Annie Simon of Nashville, Tennessee, who appears to have been a lady of means and amply able to buy. Mrs. Simon agreed in writing to take the property at the price of $50,000 and on the terms prescribed in plaintiff's contract of agency, provided the title thereto was found to be good. The case concedes that Mrs. Childress and her husband executed the contract of agency to plaintiff above stated and that he effected a sale of the property through finding a purchaser in the person of Mrs. Simon, who was ready and able and willing to buy on the terms prescribed. But it appears the sale was not finally consummated in point of fact, for the reason that the title to a portion of the property was found to be defective and the owners failed to correct it. So much appears from the written contract in evidence and admissions and stipulations of fact introduced at the trial. It is agreed, too, that plaintiff expended, by and with the authority of Mrs. Childress and her husband, $49.75 in procuring an abstract of title to the property and that this amount has not been repaid to him, though it was expended for the use and at the instance of the Childresses.

There can be no doubt that these facts are sufficient to authorize a recovery for plaintiff, unless some sufficient and valid reason apart therefrom appears to defeat his right. [See Hayden v. Grillo, 35 Mo. App.

647.] Here the owner of the property, plaintiff's principal, agreed in writing to furnish a good and sufficient title, but aside from this the obligation to do so rested upon her, in so far as the plaintiff's right to recover his commissions is concerned, for he fully performed on finding a purchaser ready and able and willing to buy on the terms prescribed in his commission of authority. [See Christensen v. Wooley, 41 Mo. App. 53, 61; Collins v. Fowler, 8 Mo. App. 588.]

But the court referred the case to the jury as if there were evidence tending to prove that plaintiff performed a dual agency and thus forfeited his right to recover, because, forsooth, he represented both the seller and the purchaser at the same time. The jury found the issue for defendant on this theory. Obviously one may not, with entire fidelity, serve two masters, representing adverse interests, in ordinary commercial transactions, at the same time, and because of this the salutary rule obtains that if a dual agency appears, without the consent of the principal, the agent forfeits his commission and may not recover. [See Corder v. O'Neill, 207 Mo. 632, 645, 646, 647, 106 S. W. 10; Connor v. Black, 119 Mo. 126, 24 S. W. 184; Neuman v. Friedman, 156 Mo. App. 142, 136 S. W. 251.] But the doctrine proceeds on the ground of fraud and bad faith. Obviously, therefore, such conduct on the part of an agent may not be presumed, but must be found from the facts of the case, and such facts must be sufficient to constitute substantial evidence on the issue thus made. After reading all of the evidence introduced at the trial several times, we are persuaded that it is wholly insufficient to support the finding of bad faith in that plaintiff represented both the purchaser and the seller of the property at the time. There is no admission nor stipulation tending to show that plaintiff represented Mrs. Simon in any way, but, on the contrary, it appears he represented the Childresses in making the sale. The only evidence said to suggest

that plaintiff occupied a position of dual agency is that of Mrs. Simon, and we copy it in full. Indeed, Mrs. Simon is the only witness who testified in the case and her evidence in full is as follows:

"Q. Mrs. Simon, please state your full name, age and present place of residence? A. Annie Simon; 56 years; 112 Vauxhall street, Nashville, Tenn.

Q. If you at any time endeavored to purchase the property owned by defendants, Matilda J. and Thos. B. Childress, on Cherry street in the city of Nashville, state with whom your negotiations were conducted. A. With Mr. Maddux.

Q. Did your negotiations in reference to this property result in a contract on your part to buy same? A. Yes, sir, I did contract to buy it.

Q. Examine Exhibit A to the deposition of Gus A. Maddux and state if that paper was signed by you and if it is the contract referred to by you? A. Yes, sir.

Q. State if your acceptance of this contract was in good faith and if you were at that time willing and able to purchase the property described in the contract on the terms and conditions therein set out, if good title to same was made to you? A. I was.

Q. Were you then and are you now financially able to pay for this property upon the conditions mentioned in this contract? A. I was in position then, but I think I could arrange it now even.

Q. State whether Mr. Maddux was in any way employed by you or was to be in any manner compensated by you for his services in connection with the purchase and sale of this property? A. I did not agree to compensate him anything.

CROSS-EXAMINATION.

Q. Mrs. Simon, did you represent yourself in this matter? A. Did I represent myself? Yes, sir.

Q. Were you going to buy this with your own money? A. Well, part of it and part the Northwestern Mutual Life Ins. Co. were to loan me.

Q. How much were the Northwestern Mutual Life Insurance Co. to loan you? A. $22,000.

Q. How much were you to pay yourself? A. The balance, $28,000.

Q. Were you at that time financially able to do that? A. Yes, sir.

Q. Nobody had any interest in the transaction except yourself? A. No, sir.

Q. How did you happen to go to Mr. Maddux, had he attended to other business for you? A. No, sir. You mean in regard to this property?

Q. I mean had he been your agent in any other matters? A. I went to his office. I gave him other property to rent, but he never succeeded in renting it.

Q. Then he had acted as your agent in other matters? A. Well, he tried to, but didn't succeed.

Q. But nevertheless he had charge of a portion of your property in an endeavor to rent it and to that extent acted as your agent, to the extent of trying to rent the property? A. Yes, sir.

Q. When did that agency cease, Mrs. Simon? A. I just can't remember. When the Riddle lease terminated, I got him to rent it and when he couldn't, then that ended it, that's all.

Q. When was that in point of time, if you remember, that he couldn't rent it? A. It is over three years ago. I think it is about three years.

Q. In regard to the purchase of the property of the defendants, did you approach Mr. Maddux about it, or did he come to you? A. I came to him.

Q. For what purpose did you go to him? A. I wished to buy some centrally located property as an investment, and I asked him if he had anything that he thought would suit me.

Q. You knew he was going to make the trip to St. Louis on the 28th, that is, start on the 27th of May last year, didn't you? A. I knew he made the trip, but don't know the date.

Q. Is the trip you refer to the one in which he went to St. Louis to get the promise from the defendants to sell the property? A. Well, he had corresponded with them long before in regard to this property, and this was the final arrangement. To be the final arrangement of my purchase of the property.

Q. Then this was the trip that you speak of that was to close up the deal? A. Yes, sir.

Q. Now, you had authorized him to make an offer for the property in question, of $45,000, did you not? A. I don't remember that. I know it was to be $50,000.

Q. Have you no recollection of telling Mr. Maddux to offer the defendants $45,000 for the property, but if he couldn't get it for that, he might increase the offer more? A. Not at that time.

Q. When did you make that statement to him? A. That was in the correspondence between them.

Q. Mrs. Simon, I am speaking now exclusively of conversations between you and Mr. Maddux without reference to the correspondence between Mr. Maddux and Mr. Childress? A. I am speaking now of the time when he went to St. Louis in regard to the $50,000.

Q. You had instructed him prior to his going to St. Louis to offer the defendants $50,000 for the property, providing, of course, always that the title was good? Is that your answer? A. That was at the time he first offered the property for sale to me.

Q. You had instructed him prior to his going to St. Louis to offer to the defendants $50,000 for the property? A. I did not. That was during the correspondence, but when he went there it was to close the sale and get their signatures.

Q. At what figure was he to close the sale? A. $50,000.

Q.  Now was any other sum mentioned immediately prior to his going to St. Louis than $50,000?  A. No, sir.

Q.  Was that when he left Nashville to go to St. Louis that he had your authority to offer $50,000 for the property, provided, of course, the title was to your satisfaction?  A.  Well, Mr. Childress positively refused to take any less before Mr. Maddux went to St. Louis—he would not take any less, he wanted $50,000 and so I just accepted to the terms he asked for.

Q.  So that he went to St. Louis to offer them $50,000 for this property?  A.  I suppose so.

Q.  When he went to St. Louis you had authorized him to go to St. Louis, and you had authorized him to offer $50,000 for the property?  A.  I had.

Q.  Upon his return from St. Louis you attached your signature to the acceptance of the offer which is marked Exhibit A to this deposition?  A.  Yes, sir.


RE-DIRECT EXAMINATION.


Q.  You stated in your cross-examination that when Mr. Maddux went to St. Louis he was authorized by you to make certain offers.  I want to ask if you had ever given Mr. Maddux any written authority of any kind or had employed him in any way to buy this property for you?  A.  Yes, I authorized him to make the trade there.  I didn't authorize him to buy it for me, I don't think for myself.

Q.  Were you making an offer through Mr. Maddux for this property?  A.  Yes, sir.

Q.  Did you expect to buy the property yourself through Mr. Maddux, or have Mr. Maddux buy for you?  A.  I can't understand that?  He acted as my agent in the matter?—no.

Q.  Was Mr. Maddux your agent in this deal or the Childress' agent?  A.  He was their agent, of course.

Q. You have stated, I believe, that you did not promise to pay him any compensation for services in this matter? A. Yes, sir. I did not expect to pay him anything.

Q. Did you sign any paper of any kind agreeing to purchase at any price the property described in exhibit A to this deposition until you signed an acceptance of the offer on May 29th? A. No, I did not. This was the only paper.

Q. Then your only contract in reference to the purchase of this property was an acceptance of the authority given by Matilda J. and Thos. B. Childress in reference to the purchase of this property? A. It was.

Q. Have you had considerable experience in the purchase of real estate? A. Well, I have had some.

Q. Do you, or not, own considerable rental property in the city of Nashville? A. I own several houses here.

Q. What do you know of the custom in the city of Nashville with reference to compensation to real estate agents in a case of sale of property, as to who pays the agent? A. I think there is a custom that the one that sells pays the commission, and I think I have had some experience and that I am somewhat of an expert in the case.

Q. State whether or not you were anxious to purchase this property and what propositions, if any, were made to defendants on your behalf in reference to waiting and giving them time to perfect the title to the premises? A. I was very anxious to get the property. I went to Mr. Maddux and asked him to write to the defendants to try and have it perfected. Now, Mr. Maddux can say what answer they gave him. I was willing to wait, but they haven't done anything towards it.

RE-CROSS EXAMINATION.

Q. Mrs. Simon, why were you anxious to close this deal? A. Because I thought it was a good investment.

Q. Didn't you think it was a bargain? A. Yes, I thought it was a bargain and good investment.''

Mrs. Simon repeats several times that plaintiff did not represent her, but, on the contrary, represented the Childresses, and it is clear that his mission to St. Louis on May 28, 1909, was not to beat down the price of the property, but rather to obtain the written authority, including the terms of sale, so that no controversy might arise thereafter. The mere fact that plaintiff had represented Mrs. Simon in connection with renting one of her buildings some three years before is insufficient to justify an inference that he represented her as an agent in purchasing this property, especially in view of her positive statement to the contrary. Fraud and bad faith in dealing is to be shown in the facts and circumstances in evidence and may not be presumed, nor will it suffice to determine it alone on conjecture and suspicion. There must be substantial evidence tending to prove it in order to sustain a finding of bad faith. Obviously the court erred in submitting this question to the jury, for there is no substantial evidence in the record tending to prove that plaintiff represented Mrs. Simon as her agent at the time.

The judgment should, therefore, be reversed and the cause remanded with direction to the trial court to enter judgment for plaintiff for $1000, the amount of the commission stipulated for in the contract, and $49.75, the amount paid out for the abstract of title, together with six per cent interest on the entire amount from the date of the institution of this suit. It is so ordered. *Reynolds, P. J.*, and *Allen, J.*, concur.