FABICK BROTHERS EQUIPMENT COMPANY, a corporation, Plaintiff-Appellant,

v.

James H. LEROUX, Defendant-Respondent.

No. 8183.

Springfield Court of Appeals.

Missouri.

Feb. 14, 1964.

Motion for Rehearing or Transfer to Supreme Court Overruled March 5, 1964.

888

Hyde, Purcell & Wilhoit, George R. Wilhoit, Jr., Poplar Bluff, for plaintiff-appellant.

Byron Kearby, Poplar Bluff, for defendant-respondent.

RUARK, Presiding Judge.

This is an appeal from a judgment based on the warranty of a Cat which couldn't hold its water.

Plaintiff Fabick Brothers Equipment Company sold to defendant James H. Leroux "one used Cat." (we understand this is the common, abbreviated, and popular term for a caterpillar tractor) "W/Hyd Dozer," with equipment including "W/Cat #46 Hyd. Controls" and a "Cat. 6A Angle dozer," at a price of $12,412.80. Taken in exchange was a "Farmall M. Tractor" and "Henry Back Hoe" at an agreed price of $3,500. Leroux executed an installment note (including time payment charges of $1,069.44) in the amount of $9,982.24. Fabick Brothers Equipment then sold the note "without recourse" to Fabick Employees' Profit Sharing Plan. In time Fabick Employees' etc. (assignee) repossessed the Cat and dozer, sold it, and sued for deficiency. At the same time, Fabick Brothers Equipment (seller) brought suit against Leroux

for the sum of $507.12, which sum it claimed represented the amount of an unpaid check given it by Leroux. It alleged that $500 of said amount had been paid over to Fabick Employees' etc., assignee, on the note, and the $7.12 was for some service charge on the machine. In the last mentioned case, Leroux answered, admitting that he owed the $7.12, and counterclaimed for breach of warranty in the sale of the Cat. Both cases were tried to the court on the same evidence. Judgment was rendered in favor of Fabick Employees' etc., assignee, on the deficiency in the sum of $1,-671.90. On the suit by Fabick Brothers, seller, judgment was rendered for plaintiff on its claim in the sum of $7.12 and in favor of defendant on his counterclaim in the amount of $2,500. Fabick Brothers appeals from this last mentioned judgment.

Defendant was in the business of moving dirt. He had been using a tractor with a back hoe machine but was not familiar with a caterpillar dozer of the type here involved. He dealt with a Mr. Hale, a salesman at plaintiff's Sikeston shop building. He testified that Hale showed him the machine. It was newly painted and Hale told him it was rebuilt, reconditioned, "and just had been through it and done everything up in perfect shape"; that it was "reconditioned throughout," in "good condition, ready to work and guaranteed to work." "It was guaranteed for one hundred and fifty working hours." Subsequent to that conversation, defendant signed a printed form purchase order, which described the equipment and thereafter recited that "Used Equipment sold 'AS IS' unless specifically warranted under Paragraph 7 on the Reverse side hereof." Paragraph seven on the reverse side contained disclaimers of liability for personal injuries or for any damage resulting from "any alleged failure of said machine to operate, nor for any implied warranties. *Any used or second hand equipment included in this order is sold without any warranty whatsoever, express or implied (except that the seller warrants title), unless said warranty is set forth in*

*full in the space next following and is initialed by both of the parties hereto."* [1] In the space below was the following:

"Sold with 150 hr. warranty. Chas. Hale

James H. Leroux"

In further paragraphs was set forth a warranty expressly limited to new machines. This new machine warranty called for replacement of parts defective in material or workmanship, a manufacturer's warranty. The order was signed on June 19, 1958, by "James H. Leroux, Purchaser," and "Fabick Bros. Equipment Co. By: Jos. G. Fabick, Sales Manager."

Delivery was made about June 24. Defendant hired an experienced Cat operator and commenced operation leveling ground and digging ditches about June 25 or 26. After the first two days' operation, trouble began. The Cat developed an elephantine thirst. *It would heat up and the driver would have to go to water and refill the radiator.* This happened several times a day and with increasing frequency. Sometimes it required as much as four or five gallons to refill the radiator. Within a few days, Leroux complained to the seller, and plaintiff's mechanics came to work on it. The first time the mechanic worked on it for two days. The machine was, of course, "down" or out of service during that period. Defendant says that after it was "patched up" it ran for another week, but from then on it was a process of working a while, making trips to a water course or well and refilling the radiator, and then "down again" while a mechanic or mechanics from Fabick Brothers worked on it. The equipment was on the first job for four days. At the second job the tractor was "down" three or four times and some two or three days each time. On this job the mechanics for plaintiff pulled the "head" (whatever that is) off it and performed some operation, whether exploratory or correctional we do not know since we are not familiar with mechanical terms.

Defendant testified that "we got to the place where we was spending as much time running after water on that job as we were doing the job."

At the time defendant made his first complaint and plaintiff's mechanic attempted to rectify the trouble, the machine had operated about forty hours. It was on the second job when they first "pulled the head." It had not then gone one hundred fifty hours. After that, and on other jobs, the difficulty continued, and plaintiff's mechanics continued to work on it. According to defendant the machine was, at the beginning, "down" about one-third of the time and eventually got to where it was down about one-half of the time. Nevertheless, defendant continued, because he had "work to go to," and the process of working, going to water and refilling the radiator, and shutting down for repairs continued until the operator quit. This operator testified, "I couldn't survive on the amount of work I was getting, and I had to quit Mr. Leroux." The operator's work records correspond roughly with defendant's testimony. They reflect frequent occasions when the machine was not working and when it worked only parts of days. These time records, however, include the time driving to water and refilling the radiator, because the operator was paid for this time, although defendant could not charge the customers for it. This witness testified as an experienced heavy machine operator that under normal conditions a rebuilt machine in good working order would require no "down" time during the first one hundred fifty hours except a normal thirty minutes per day spent in normal servicing.

Finally, apparently in the latter part of September, defendant pulled the machine into a D-X service station and a Mr. Davis (plaintiff's witness) came out again and pulled the head off and replaced it. Defendant says this was the third head. Davis testified, "That was when we finally detected what was causing the water leakage."

---

1. All emphasis is our own.

Q. "And you finally determined on October 2nd that that was what the trouble was, that there was something wrong with the head, is that the reason it used water, is that right?" A. "That is right." The witness said when he took the old head off he "found it was defective in a certain way, and we put another head on it in place of it." He said he had taken the head off before but "we didn't detect that defection then." Defendant testified that on this last occasion he told Davis, "I will go ahead and tell them to come and get it, and I am done with it," and that Davis said, "If I had been you, I would have done it a long time ago." Davis denied making this last statement. That night defendant called plaintiff and the tractor was repossessed shortly thereafter.

On July 24, defendant paid plaintiff a five-hundred-dollar installment on the note. He said plaintiff had been working on the machine and he paid it because he thought "they" would fix it. They said they would fix it. At some time not clear, he told plaintiff, "Well, I can't pay for it with you working on it all the time."

On September 15, defendant gave the check for $507.12 which is the subject of plaintiff's claim. At the time this second payment was made more than one hundred fifty working hours had expired. He testified that at that time Mr. Hale told him, "they would fix it if it cost them a million dollars." "I still had in my mind I was going to keep it if they would get it to where it would work, and they kept working on it." The $507.12 check was refused payment because of insufficient funds. Subsequently defendant stopped payment.

Appellant contends that evidence of statements made by the salesman Hale in regard to the condition of the machine was incompetent because (a) the verbal statements were merged into the subsequent written purchase order and (b) they tended to vary or alter the written terms of such order.

■ Two of the exceptions to the parol evidence rule are that verbal testimony is received, not to add to, contradict, oppose, or change the terms, but to explain and clarify the written agreement and thus establish the actual meaning (a) when it is ambiguous [2] and (b) where the writing shows on its face that it is incomplete and does not set forth the full agreement.[3] In those circumstances parol testimony (if not repugnant to the express terms of the writing) is competent to show the real intention of the parties. In reality, a writing which shows on its face that it does not embody the whole contract is, in that sense, ambiguous.

■ The writing stated "sold under 150 hr. warranty." But warranty to do what and against what? To run at sixty miles per hour? To fly? Not to use more than two gallons of fuel per day? Not to break down? Or what? Obviously the writing is incomplete and does not cover the whole of the actual agreement. It cannot be said that the manufacturer's warranty (in later paragraphs) as to new equipment was applicable, because those paragraphs are *expressly* restricted and applicable to new machinery only; but even if it could logically be argued that the contract was reasonably susceptible of the interpretation that the new equipment warranty might be applicable, the two interpretations would create

2. Fisher v. Miceli, Mo., 291 S.W.2d 845 (5); Baptiste Tent & Awning Co. v. Uhri, Mo.App., 129 S.W.2d 9; Giraldin Bros. Real Estate Co. v. Stiansen, Mo. App., 315 S.W.2d 636(3); Willson v. Chicago Bonding & Surety Co., Mo., 214 S.W. 371(3); Securities Inv. Co. of St. Louis v. International Shoe Co., Mo.App., 5 S.W.2d 682.

3. Humana Co. v. Hughes, Mo.App., 213 S.W. 515; Francis v. Saleeby, Mo.App., 282 S.W.2d 167, 169; Goodspeed v. Grand Nat. Bank, Mo.App., 46 S.W.2d 913; Simrall v. American Multigraph Sales Co., 172 Mo.App. 384, 158 S.W. 437(2); Charles A. Liemke Co. v. Krekeler Grocer Co., 231 Mo.App. 169, 95 S.W.2d 820.

an ambiguity which would require evidence to clarify.[4] We conclude, therefore, that the oral declarations of representation and warranty were competent to show what the warranty was.

■ It is also contended that the statements of sales representative Hale were not competent because there was no showing that he had authority to make any warranty. Laying aside any question of implied authority of a salesman in a situation such as this, we note that plaintiff's office manager, Henry Switala, testified that the manager, Joe Fabick, had the supervisory power in respect to warranties. The clause containing reference to the 150-hour warranty was signed by Hale, but the whole agreement which *included* this reference was signed by Fabick as manager. The manager thus was not only a party to the contract, but also ratified the warranty expressed by Hale.

■ We believe that the common sense interpretation of the warranty is that the tractor was rebuilt and in good working condition and would furnish the normal service to be expected of such a machine without breakdown due to defective parts or workmanship for one hundred fifty working hours. This seems to have been the interpretation of the parties, since the plaintiff continued to attempt (without charge except for one $7.12 item) to make repairs and get the machine to run normally even after the one hundred fifty hours had expired.

■ In its *argument* appellant appears to contend that the warranty expired because the Cat had three hundred hours on its meter when repossessed, more than the one hundred fifty to which the warranty was limited. The evidence justified the conclusion of the court that the machine had within it "the seeds of defect" when it was sold. Perry v. Van Matre, 176 Mo. App. 100, 161 S.W. 643, 648. Therefore, the warranty was breached when the sale was made. The defendant could have retained the machine and recovered either affirmatively or by way of defense for the difference in actual value and value as represented.[5] Nor can defendant be held to have waived the breach. The undisputed evidence is that he made repeated complaint as to the defect after the tractor had gone forty working hours and that thereafter and before one hundred fifty hours had gone the plaintiff had commenced working on it in an endeavor to remedy the defect, even to the extent of "pulling the head." The conclusion to be drawn is that defendant had work or use for the machine; that he was anxious to retain it if it could be made to work; and that the plaintiff was repeatedly trying to make it fulfill the requirements of the warranty. Under such circumstances, we think plaintiff cannot say that he waited too long before he "told them to come and get it." Compare the conduct of the parties in Green v. Cooke Sales and Service, supra, Mo.App., 284 S.W.2d 880.[6]

The judgment is affirmed.

STONE and HOGAN, JJ., concur.

4. Green v. Cooke Sales and Service, Mo. App., 284 S.W.2d 880; Dimick v. Noonan, Mo.App., 242 S.W.2d 599; Huddleston v. Huddleston, Mo.App., 11 S.W.2d 1065.

5. Hope Engineering & Supply Co. v. D. N. Lightfoot & Sons, Mo.App., 193 S.W. 624; Dubinsky v. Lindburg Cadillac Co., Mo. App., 250 S.W.2d 830; Emerson-Brantingham Implement Co. v. Simpson, 205 Mo.App. 56, 217 S.W. 559.

6. See also Kerosene Motor & Tractor Co. v. Douglass, 210 Mo.App. 481, 240 S.W. 836; Wayne Tank & Pump Co. v. Evans, Mo.App., 15 S.W.2d 895; International Harvester Co. of America v. Capps, Mo.App., 205 S.W. 252; J. I. Case Threshing Mach. Co. v. Gardner, 159 Mo. App. 274, 140 S.W. 318.